Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | Geraldine Soat Brown |
|---|---|---|---|
| **CASE NUMBER** | 96 C 1122 | **DATE** | 3/26/2002 |
| **CASE TITLE** |  | BAGC vs. City of Chicago | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set out in the attached Memorandum Opinion and Order, non-parties' motions to quash subpoenas served by the City of Chicago are granted [259, 260, 261, 264, 265, 266]. The City of Chicago's cross motion to compel [271] is denied. Non-parties' position statements joining the motions to quash [282, 283, 284] are sustained. Enter Memorandum Opinion and Order.

*/s/ Geraldine Soat Brown/*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAR 27 2002 date docketed | 293 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | 3/26/2002 date mailed notice | |
| tw | courtroom deputy's initials | 02 MAR 26 PM 3:26 Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BUILDERS ASSOCIATION OF GREATER CHICAGO, <br> Plaintiff, <br><br> v. <br><br> CITY OF CHICAGO, <br> Defendant. | Cause No. 96 C 1122 <br><br> Judge James B. Moran <br> Magistrate Judge Geraldine Soat Brown |

DOCKETED
MAR 27 2002

## MEMORANDUM OPINION AND ORDER

Geraldine Soat Brown, United States Magistrate Judge

In November, 2001, following the decision by the District Judge overruling objections by the defendant City of Chicago (the "City") to this Court's order of August 30, 2001 quashing 500 subpoenas served by the City upon various contractors and subcontractors [Dkt ## 225, 198], the City served subpoenas upon 26 area unions and union apprenticeship programs to obtain documents identified in Riders to those subpoenas. Copies of the Riders for the subpoenas served upon the unions and apprenticeship programs were attached as Exhibits 5 and 6 respectively to the City's Combined Response to Motions to Quash Subpoena and Memorandum in Support of its Cross Motion to Compel ("City's Response.") [Dkt # 272.] None of the subpoena recipients are parties to this lawsuit. Various subpoena recipients filed motions to quash; others filed position statements joining in the motions to quash filed by others.[1] The City filed a Cross Motion to Compel seeking to enforce its subpoenas, and withdrew its motion as to various recipients who had complied.

---

[1] See Appendix A hereto.

1

[Dkt ## 271, 268.] Plaintiff, the Builders Association of Greater Chicago (the "BAGC"), filed a Brief in Response to City's Motion to Compel. [Dkt # 280.] For the reasons stated herein, the City's Cross Motion to Compel is DENIED, and the motions to quash are GRANTED as identified on Appendix A hereto. The requests by the movants and the subpoena recipients who filed position papers in opposition to the subpoenas for their fees and costs in bringing the motions to quash and resisting the City's motion to compel are granted pursuant to Fed. R. Civ. P. 45(c)(1).

The subpoenas.

The City's subpoenas seek "documents" (defined to include virtually all forms of information storage and retrieval) from 1980 to the present. The City seeks six categories of documents from the unions and four categories of documents from the apprenticeship programs. From the unions the City seeks (in essence): all consent decrees entered into between the union and any governmental body relating to minority or women membership; all communications from the union to its members about the consent decree; all union membership, apprenticeship or signatory lists; all graphs, charts or summaries of racial, ethnic or gender demographics of union members or non-union members permitted to work on union jobs as permit holders; and, from 1985 to present, all documents from the union to its members providing information on how to not comply with Minority and Women Business Enterprise ("M/WBE") participation goals on publically let contracts or private contracts with M/WBE participation requirements. (City's Resp., Ex. 5.) From the apprenticeship programs the City seeks (in essence): all graphs, charts or summaries disclosing the racial, ethnic or gender demographics of persons who: (a) applied for training; (b) were accepted for or admitted to training; or (c) successfully completed training; and all documents that show the locations at which information about the training program and how to apply for it was disseminated. (City's Resp.,

2

Ex. 6.)

The City argues that the time period 1980 to the present is designed to gather evidence for five years before the enactment of the challenged ordinance in 1985; however that still imposes a burden on the subpoena recipients to search for documents that are more than 20 years old.

The Motions to Quash.

The motions to quash filed by the unions and apprenticeship programs emphasize that they are not parties to this lawsuit. They argue that the subpoenas impose an undue burden upon the respondents, and that the materials sought are not relevant to any issue in this case. For example, the Chicago Journeyman Plumbers' Local Union 130, along with its Technical Engineering Division, submitted the affidavit of James T. Sullivan, the Secretary-Treasurer of the Local and a union member for 27 years. (Sullivan Dec. ¶ 1.) [Dkt # 279.] Mr. Sullivan states that there is no requirement that any owner of a plumbing business that has a contract with Local 130 be a member of Local 130 or have the skills required by the Local of a journeyman plumber or apprentice. (Sullivan Dec. ¶¶ 5-6.) He states that not every contractor that has an agreement with the union is qualified to bid on a City project. (*Id.* ¶ 11.) Local 130 does not identify which of its signatory contractors are or are not qualified to work on City projects. (*Id.*)[2]

The memorandum in support of the motion to quash filed by the Plumbers' Joint Apprenticeship Committee states that the apprenticeship program sponsored by the Joint Apprenticeship Committee currently has 482 apprentices in its program, and is accepting

---

[2] The Technical Engineering Division of Local 130 has moved to quash the subpoena served upon it for information relating to its apprenticeship program because it does not have an apprenticeship program. [Dkt # 266.]

3

applications for enrollment of apprentices in the 2002-2003 program. (Mem. Supp. Mot. to Quash at 2.) [Dkt # 278.] It expects that it will receive and process between 1200-1600 applications between February and April 2002. (*Id.*) The memorandum includes an affidavit by Richard O'Connor, the Training Coordinator for the program. Mr. O'Connor states that the program maintains and submits to the United States Department of Labor's Bureau of Apprenticeship and Training the records required by the Department concerning the racial and gender characteristics of the persons who successfully complete the program, and those records are available to the City, but the program does not keep summaries of the racial or gender graduates of the program. (O'Connor Dec. ¶¶ 5, 10-11, 14.) Mr. O'Connor describes the program's limited staff, and estimates that it would take between 80 to 120 hours to review the stored records of the program to search for documents responsive to the first three categories of the subpoena. (*Id.* ¶ 16.)

The motion filed by the Pipe Fitters Association, Local 597 and Pipe Fitters' Training Fund states that there are approximately 500 apprentices enrolled in the program at any given time, and that approximately 500 to 900 persons apply for admission to the program every year. (Mot. to Quash at 2.) [Dkt # 261.] To find the documents sought by the City, the Local and the Fund would require attorneys, information technology specialists and staff to sift through documents and computer data. (*Id.* at 3.)

At the oral argument held on March 7, 2002, the attorney for the Carpenters District Council and apprenticeship program stated that at any point in the late 1990's the union had over 35,000 members and approximately 3,200 signatory contractors. The union's computer database of signatory contractors does not maintain the past records of signatory contractors who might once have been on the list but have since gone out of business. (Tr. March 7, 2002 at 39-40.) The

4

attorney for the Bricklayers Local and its apprenticeship program stated that, to his knowledge, his client does not maintain a signatory list but rather individual files of employers that have collective bargaining agreements with the union.

As to the legal relevance of the information sought, the movants argue, in essence, that the information sought from them is substantially similar to what the City sought in the previously-quashed 500 subpoenas to the contractors, except that information's connection to the issues in this lawsuit is even more tenuous.

<u>The City's argument in support of the subpoenas.</u>

In its Response in opposition to the motions to quash and in support of its motion to compel, the City refers to the quotation in the Supreme Court's decision in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 509 (1989), that a disparity in the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors can give rise to an inference of discriminatory exclusion. (City's Resp. at 8-9.) The City then argues that:

> the issue of ready, willing, and able WBEs and MBEs finds it genesis not in the list of such companies certified by the public body, but in . . .the discriminatory and artificial barriers placed in the paths of women and minorities by members of the construction trade industry to prevent them from ever become [sic] ready, willing and able WBEs and MBEs.

(*Id.* at 9.) The City further states:

> The City seeks to determine whether, in the Chicago area construction industry, as the number of union workers declines, if there is a correlative decline in the racial and gender composition of those workers, or if "the good old boy" network historically prevalent among unions is operating to protect majority male union workers while excluding others.

(*Id.* at 10.)

5

When asked at oral argument what the City intended to do with the information that would be generated by the subpoenas, counsel for the City disclaimed any intention to attempt to construct a statistical model. (Tr. March 7, 2002 at 10.) Instead, counsel stated that the City wanted to talk to the people who were unsuccessful in the apprenticeship programs:

> We're looking for facts; we're not looking for data. We want to—we want to talk to the people who washed out [of the apprenticeship programs]; we want to find out why they washed out, if they have an opinion why they washed out or if they have facts. Did they wash out because they were targeted because they were a minority or a woman? "What facts do you have that you can give us that we can give to the trial judge to show that you washed out because of per- – all-pervasive prejudice?"

(Tr. March 7, 2002 at 11.)

The City's theory of relevance, as described by counsel for the Defendants-Intervenors, is that the evidence will be used to demonstrate that discrimination exists in the construction industry, which prevents the formation of potential M/WBEs:

> If you have a construction industry that engages in egregious discrimination. . . . [t]hen you're not going to have minor- –MBEs and WBEs with offices and phones and equipment ready, willing and able to work. If the discrimination is widespread enough and vicious enough, then there is not going to be the opportunity for MBE owners and WBE owners to invest capital and wait around for the business to come by. Nobody would lend them money in order to operate. That degree of discrimination would prevent businesses from forming, but presumably would be allowed as evidence under the *Croson* standard because the *Croson* standard focuses on discrimination in the construction industry.

(Tr. March 7, 2002 at 28.)

Furthermore, the City stated, it wants to present evidence demonstrating that M/WBEs could go to the union hall and get additional workers if necessary, in order to refute the discussion in the Seventh Circuit's opinion in *Builders Association of Greater Chicago v. County of Cook*, 256 F. 3d 642, 648 (7th Cir. 2001), that the set-aside quota will result in a fewer available M/WBEs for private contracts by drawing M/WBEs subcontractors into public projects and away from private ones.

6

(City's Resp. at 15; Tr. March 7, 2002 at 20-21.)

The City's counsel acknowledged that the City had been unable to locate any authority to support using subpoena power to compel non-parties to cull through old records to locate and produce original evidence to demonstrate a model or a pattern. (Tr. March 7, 2002 at 23.)

## DISCUSSION

The standards applicable to enforcing a subpoena directed to a non-party were previously discussed in this Court's August 30, 2001 Memorandum Opinion, and will not be recited herein. The issue on the present motion, then, is whether the burden imposed upon the subpoena recipients is undue in light of the relevance of the materials sought to the issues in the lawsuit. As discussed in the District Judge's Opinion regarding the City's previous subpoenas:

> The central issue here is whether the City had discriminated against minority contractors or had stood passively by when it knew that contractors were discriminating against minority contractors on public construction jobs, thus justifying the adoption of an affirmative action program in April 1985, and then amended in 1990.
>
> * * * * *
>
> The issue here is not whether there has been or is discrimination in the construction industry; it is whether the City was justified in requiring a set-aside program for public projects in 1985 and 1990.

*BAGC v. City of Chicago*, No. 96 C 1122, 2001 WL 1414192, *1 (N.D.Ill. Nov. 9, 2001)(Moran, J.).

The BAGC maintains, as it previously had, that so-called "post-enactment evidence" is not admissible to support the ordinance; and the City contends, as it previously had, that such evidence is admissible. This ruling assumes, *arguendo,* as did the earlier ruling on the motion regarding the City's subpoenas to contractors, that such evidence might be admissible, if relevant to a material issue.

An appropriately narrowly-tailored set-aside program can be justified as a remedy for

7

intentional discrimination by the municipality in the awarding of contracts or for the municipality's "passive participation" in discrimination against minority and women contractors in the awarding of contracts. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989); *BAGC v. County of Cook*, 256 F.3d at 645. It cannot be justified as a remedy for discrimination in society in general. *Croson*, 488 U.S. at 498, 505.

Apparently, the City's goal in seeking this discovery from the unions and apprenticeship programs is not to demonstrate that there has been discrimination in decisions not to contract with available M/WBEs. Rather, the City's approach proceeds from the assumption that there have been too few M/WBEs to select from, and then seeks to demonstrate that historically there have been barriers to minorities and women becoming owners of contracting companies, and that discrimination in union membership is one such barrier.

A major gap in the City's discussion is any demonstration that there is a relationship between union membership and the City's ordinance. The City cites the issue posed by the *Croson* case: Whether there is a disparity between the number of M/WBEs able to perform a particular service and the number of such contractors actually engaged by the city or city's prime contractors. However, the City concedes that there is no requirement that an owner of an M/WBE be a union member. (Tr. March 7, 2002 at 17.) Apparently, there is no requirement that a contractor or subcontractor bidding on a City contract have agreed to use only union members in its workforce, as long as the contractor pays the prevailing wage or union scale. (*Id.*) The City argues that its evidence will show that most successful bidders on city contracts employ a union workforce, although its counsel could not state on oral argument whether the management, owners and shareholders are union members. (*Id.*) Like the County's ordinance discussed by the Seventh Circuit in *BAGC v. County of Cook*, 256 F.3d at

8

646, the City's ordinance benefits minority and women business *owners*, not individual workers. The City's ordinance does not address the gender or racial make up of a contractor's workforce and is not designed to remedy discrimination in the hiring of workers or discrimination by unions or their apprenticeship programs in the selection of union members.

Furthermore, the City has not cited any cases holding that evidence of discriminatory barriers to entry in the construction industry in general or to union participation in particular is admissible to support the City's burden in justifying the ordinance. The *Croson* decision, which the City cites, suggests that such evidence is not what the City needs to carry its burden. The municipality in *Croson* attempted to support its ordinance as:

> remedy[ing] various forms of past discrimination that are alleged to be responsible for the small number of minority businesses in the local contracting industry. Among these the city cites the exclusion of blacks from skilled construction trade unions and training programs. This past discrimination has prevented them "from following the tradional path from laborer to entrepreneur."

488 U.S. at 498, citation omitted. However, the Court stated:

> While there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify a rigid racial quota in the awarding of public contracts in Richmond, Virginia.

*Id.* at 499.

On a practical level, the City has been unable to articulate what it would do with the information that would be generated by the subpoenas. It is difficult to see how that information could be admissible evidence or lead to admissible evidence. *See* Fed. R. Civ. P. 26(b)(1). The City's counsel's suggestion at oral argument that the City is looking for facts not data is inconsistent with the fact that its subpoenas seek data: graphs, charts and summaries. In fact, the subpoenas do not ask for the names of unsuccessful applicants to the apprenticeship programs, so the City's

9

counsel could not use the information to pursue the reasons why these persons did not succeed. Based on the representations in the motions, supporting affidavits and argument, the applicants to the 26 subpoenaed apprenticeship programs must number at least in the tens of thousands over the twenty-year time span of the subpoenas, and it appears that complete data is unlikely to be available for all of those years for all of those programs. Again, as with the subpoenas issued the contractors, the City does not describe into what form this mass of data about racial and gender characteristics of applicants and graduates would be assembled for presentation to the trial judge.

Furthermore, even if eliminating barriers to the establishment of M/WBE formation, as opposed to remedying past discrimination against existing M/WBEs, were a constitutionally-acceptable goal of a set-aside ordinance, the City's argument that discrimination in union membership and apprenticeship programs is a barrier to the formation of M/WBEs requires proof that there has been and continues to be such discrimination. It cannot be assumed that any of the unions or their apprenticeship programs would concede that racial, ethnic or gender discrimination has been or remains a barrier to membership in the union or admission to the apprenticeship program. The proof would be different for each of the unions and their programs. The City disclaimed any plan to present mini-trials to the District Judge to prove that there has been discrimination in each of the 26 subpoenaed unions and apprenticeship programs (Tr. March 7, 2002 at 14-15), but it does not say what other use the information it seeks in the subpoenas would have.

Given the fact that the City does not require its contractors or subcontractors to have union contracts or even to employ union workers, the burden of requiring the unions to search for and produce twenty-years' worth of signatory lists cannot be justified. Being a signatory on a union collective bargaining agreement is simply not a necessary element of being a ready, willing and able

M/WBE. The signatory list may not even identify which signatories are certified M/WBEs qualified to work for the City. (Sullivan Dec. ¶ 11.) Signatory lists are not necessary to show that an M/WBE with a union contract could go to a union hall and obtain additional workers, assuming that such proof were relevant.

The City has failed to demonstrate any relevance of the information sought that would justify the burden of requiring a large subset of non-parties to search through twenty years of files to locate documents.

Therefore, the motions to quash the City's subpoenas served upon the unions and apprenticeship training programs are GRANTED; the City's cross motion to compel compliance with the subpoenas is DENIED. The subpoena recipients who filed motions to quash or position statements adopting the motions to quash filed by other subpoena recipients are hereby awarded their reasonable attorneys' fees and costs incurred in doing so, pursuant to Fed. R. Civ. P. 45(c)(1). They and the City are directed to proceed pursuant to Local Rule 54.3 (d), (e) and (f). Any statement of fees and costs sought must be served upon the City's counsel no later than April 16, 2002.

**IT IS SO ORDERED.**

GERALDINE SOAT BROWN
**United States Magistrate Judge**

**DATED: March 26, 2002**

# Appendix A

| Party Name | Brief Name | Docket Number | Ruling |
|---|---|---|---|
| Electrical Joint Apprenticeship and Training Trust | Motion to quash subpoena | 259 | Granted |
| Technical Engineering Division, Chicago Journeymen Plumbers' Local Union 130, U.A. | Motion to quash subpoena | 260 | Granted |
| Pipe Fitters Association, Local 597 U.A.'s and Pipe Fitters' Training Fund | Motion to quash subpoena | 261 | Granted |
| Chicago Journeyman Plumbers' Local Union 130, U.A. | Motion to quash subpoena | 264 | Granted |
| Plumbers' Joint Apprenticeship Committee, Local 130, U.A. | Motion to quash subpoena | 265 | Granted |
| Technical Engineering Division, Chicago Journeymen Plumbers' Local Union 130, U.A. | Motion to quash subpoena | 266 | Granted |
| City of Chicago | Cross Motion to Compel | 271 | Denied |
| Chicago and Northeast Illinois District Council of Carpenters and the Carpenters Apprentice & Training Program | Position Statement Joining in the Motions to Quash | 282 | Sustained |

1

| Party Name | Brief Name | Docket Number | Ruling |
|---|---|---|---|
| **Ceramic Tile Layers and Terrazzo Workers Local 67 and its Apprenticeship Training Program** | Position Statement Joining in the Motions to Quash | 283 | Sustained |
| **Sheet Metal Workers' Local 73 and its Apprenticeship Training Program** | Position Statement Joining in the Motions to Quash | 284 | Sustained |

2