# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 1122 | **DATE** | 12/29/2003 |
| **CASE TITLE** | BUILDERS ASSOCIATION OF GREATER CHICAGO vs. CITY OF CHICAGO | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

MEMORANDUM OPINION AND ORDER

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion And Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | DEC 2 9 2003 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | 598 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | date mailed notice | |

LG — courtroom deputy's initials

U.S. DISTRICT COURT CLERK

03 DEC 29 AM 4:07

Date/time received in central Clerk's Office — mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BUILDERS ASSOCIATION OF GREATER CHICAGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 96 C 1122 |
| | ) | |
| CITY OF CHICAGO, a municipal corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In 1996, plaintiff sued defendant to challenge the City's construction contract set-aside programs. The suit languished while a companion action against Cook County pressed forward. On November 2, 2000, Judge Grady struck down the County ordinance, Builders Association of Greater Chicago (BAGC) v. County of Cook, 123 F.Supp.2d 1087 (N.D.Ill. 2000). That decision was affirmed in BAGC v. County of Cook, 256 F.3d 642 (7th Cir. 2001). Faced with those opinions, the City began an intensive preparation for trial, with a litigation strategy considerably different from that of the County, and BAGC did likewise. And a long trial ultimately followed.

That trial necessitated this court reliving a period of Chicago history. The Faustian compact regarding slavery, imbedded to some extent in the Constitution and believed by many as essential to obtain agreement by a majority of the states for that Constitution, came to an end by war. Although the Fourteenth Amendment decreed equal protection of the laws, the Tilden-Hayes election of 1876 and judicial acceptance of the separate-but-equal doctrine led to almost a century of segregation of African-Americans and their exclusion from the mainstream of

*598*

American society. Only in the aftermath of World War II did substantial cracks in those barriers to participation begin to appear. The armed forces were integrated in 1948, and in that same year the Democratic Party platform began a major shift in political alignments. Six years later the Supreme Court decided <u>Brown v. Board of Education</u>, 347 U.S. 483 (1954), opening the way for continuing minority victories in the courts. And ten years later Congress threw the full weight of federal power against discrimination by enacting the Civil Rights Act of 1964.

Although Chicago did not suffer the legally mandated discrimination of the Southern states, it was a segregated city – the most segregated city in the United States according to Edwin Berry, President of the Chicago Urban League – and the breaking down of the barriers has been a long, slow, painful and continuing process. The divided society has been chronicled in such books as Nicholas Lemann's <u>The Promised Land</u>, and Dempsey Travis' <u>An Autobiography of Black Politics</u>, and countless other books and novels. One need only string together a series of events and phrases to capture the depth of that division prior to 1983 – the Great Migration of World War I, the 1919 race riot, Bronzeville, the second migration during and after World War II, Trumbull Park, Marquette Park, Gage Park, Cicero, the Martin Luther King marches, the 1968 riots, the Hauser Report, Willis wagons, public housing, <u>Gautreaux</u>, the death of Fred Hampton, the exclusion of African-Americans from employment in Loop department stores, racial steering, white flight, panic peddling, red-lining . . . . City government was implicated in that history. Among other things, the federal courts mandated intensive changes in the employment practices of the police and fire departments.

The exclusion of African-Americans from the construction industry was particularly

telling. For many years the avenue into the construction trades was through the Washburne Trade School, which was partly funded through public monies and which required union approval of apprenticeships. In 1960 it had 2700 apprentices in training, of whom 26 were black. Washburne Trade School, Edward A. Marciniak (1986). While that increased to 373 of 3467 in 1970, and increased considerably more as a percentage by 1985, by then much of the apprenticeship training had shifted to union-financed programs in the City and suburbs, where accountability was far less. In the meantime, several trade unions – virtually all white and apparently resistant to change – had been compelled to initiate changes by litigations leading to consent decrees. In 1969 less than 5% of the Chicago area journeymen were minorities, and they were concentrated in the lower-paying trades. Of the nineteen craft trades, eleven had less than 1% minorities. The voluntary Chicago Plan was initiated in 1970, and failed. The New Chicago Plan was initiated in 1972, and quickly failed. "Judicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice." United Steelworkers of America, AFL-CIO-CLC v. Weber, 443 U.S. 193, 198, fn.1 (1979). Chicago was no exception. "The backdrop to this case of individual racial discrimination is the historic resistance within the building trades in the Chicago area to accepting racial and ethnic minorities into their ranks." Daniels v. Pipefitters' Association Local Union No. 597, 945 F.2d 906, 909 (7th Cir. 1991).

That history was primarily racial exclusion. Women then were virtually unrepresented in the construction industry. The prevailing sentiment in the industry was that construction was not women's work, although other positions, such as secretary, clerk, teacher and flight attendant, were open to them. Hispanics and Asians were also virtually unrepresented in that

industry, with their percentage of the population being, respectively, rather small and very small, and largely confined to close-in Chicago neighborhoods.

Harold Washington was elected mayor in 1983 after an election marked by racial overtones. He was immediately challenged by almost all white aldermen, leading to what became known as the Council Wars. It was in this historical context, and the context of federally mandated programs through the United States Department of Transportation, that he issued an executive order initiating set-aside programs. That order was based, in substantial respect, on two reports, Official Report of the Task Force on Affirmative Action (1985), and the Study of Minority- and Women-Owned Business Enterprises (M/WBE) Procurement Programs for the City of Chicago (1985), known as the Lowry Report.

The Task Force Report focused upon City employment, which itself, in police and fire, was the subject of federal decrees. The thrust was that blacks, Hispanics, Asians and women were far under-represented in City employment compared to the workforce in Chicago, due in considerable extent to patronage and dependence on union referrals. The Lowry Report focused on City procurement. There too the thrust was that minorities and women were far under-represented in City procurement. According to the Lowry Report, longstanding relationships made it difficult for minority and women enterprises to compete. An entrenched bureaucracy used acceptance of "low-ball" bids thereafter renegotiated, and rigged specifications, to continue business as usual, and established firms (meaning white male-owned firms) had the resources to meet high bond and bid deposit requirements. The Report indicated that overt discrimination was a pervasive factor.

Then came City of Richmond v. J. A. Croson Co., 488 U.S. 469 (1989). That case made

it abundantly clear that under-representation in an historical context of industry discrimination was not enough. The City had to establish – subject to a strict scrutiny standard – that a set-aside program was a remedy for its own past discrimination or its passive participation in discrimination, and that it was narrowly tailored to remedy that discrimination. The Court there noted, however, that great statistical disparities could, in appropriate circumstances, justify an inference of discriminatory exclusion and furnish a compelling interest for programs to remedy a racially-segregated construction market. For instance, "Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise . . . . In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion . . . . Moreover, evidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend support to a local government's determination that broader remedial relief is justified." *Id.* at 509.

Croson led to two consequences relevant here. One was a greatly increased reliance on econometrics and regression analysis, coupled with anecdotal evidence, to justify set-aside programs, despite, in many cases, the paucity of reliable, relevant data bases (the problem of finding reliable, relevant data bases has lessened in the intervening years, but it remains, as we shall see). The other was a significant effort by the City to address the concerns expressed in Croson. On May 19, 1989, Mayor Richard M. Daley appointed a former federal judge and two distinguished lawyers, one of whom is now my colleague, to recommend an effective minority

set-aside program that would survive constitutional challenge under the <u>Croson</u> decision.

On March 29, 1990, the panel issued its report, Report of the Blue Ribbon Panel – 191 pages of analysis of the then state of the construction industry in Chicago, a review of City purchasing practices and detailed recommendations for a set-aside ordinance and its implementation. That was followed by 18 days of hearings before the City Council Budget Committee, including approximately 40 witnesses and 170 exhibits, and extended debate before the City Council. The information before the City Council included the Report, the Lowry Report, and anecdotal and statistical evidence.

The result of that effort was an ordinance adopted on July 31, 1990, which legislatively established an affirmative action set-aside program for City procurement, encompassing construction, goods and services. The ordinance recognized as a "Minority-Owned Business" (MBE), a "Local Business" (essentially, located and mostly working in the six-county Chicago metropolitan area), majority-owned and controlled by a "Minority Group." "Minority Group" was defined as African-American, Hispanics (persons of Spanish culture with origins in Mexico, South or Central America or the Caribbean Islands), and Asian-Americans (persons with origins in East Asia, Southeast Asia, the Indian subcontinent or the Pacific Islands). It also recognized as "Women-Owned Business" (WBE) a local business majority-owned and controlled by women. During the initial years the MBE and WBE set-aside percentages decreased annually, as the "Target Market Contract" program kicked in. The Target Market Contract program (Target Market program) restricted competition for some contracts solely to MBEs and WBEs. Target Market contracts were, to the extent practicable, all contracts under $10,000 and, more significantly, specifically designated contracts of far larger size. The

aim was to provide general contracting opportunities for MBEs and WBEs, who, in turn, could subcontract up to 50% of the contract value to non-MBEs or -WBEs. To facilitate the performance of those contracts the City could expedite payments, reduce retainages and advance startup costs.

By 1994 the goal was that MBE joint venture and subcontract value would be 16.9% of all subcontracts and that MBEs would be awarded 10% of all prime contracts under the Target Market program. For WBEs, the corresponding percentages were 4.5% and 1%. The overall goals were 25% of dollar value to qualified MBEs and 5% to qualified WBEs. To qualify, MBEs and WBEs had to be certified. A special list was to be created for the Target Market program relating to designated contracts. Waivers were possible in appropriate circumstances. On large contracts efforts would be made to exceed the percentage goals. Contractors could receive some credit toward goals for City contracts by the use of MBEs and WBEs on non-governmental projects (although this has had virtually no use). There was no sunset provision. The ordinance was amended in 2000 to permit bonding waivers up to $100,000, and the City can now pay subcontractors directly. A firm "graduates" from the program if its annual revenues exceed $27,500,000 on average over three years.

The legal construct with which we are dealing requires a careful analysis and raises many questions. To what extent must a local government present "strong evidence" of discrimination at the time of adoption of a set-aside program, or be subject to legal challenge, or, to what extent, may it wait to develop that evidence until the legal challenge arises? What is meant by "available, willing and able," and how is that measured? What is meant by "societal discrimination"? What is "narrowly tailoring"? What is "passive participation"?

And there are others. Before answering these questions, however, it may prove helpful to take

a look at the history of the Chicago construction industry: the status of MBEs and WBEs over

time, the perceived barriers to entry into the market of those enterprises, the success of these

enterprises after entry, the information available to document such barriers and successes, and

the response of local governments – particularly the City of Chicago – to the needs of these

enterprises. This history may or may not affect the ultimate outcome of the case, but I believe

it helpful to document it at this stage. Such factual determinations are peculiarly the province

of the trial court, even though their relevance to the ultimate issues is not.

I have been given no reason to believe that the construction industry in the Chicago area

is much different from that elsewhere in the country, with one notable exception: Chicago is

a union town. That is, construction projects here are more likely than many other places to be

staffed by trades covered by collective bargaining contracts. While the City projects need not

employ union labor, so long as the wages are comparable, they invariably do.

Construction is a fluid and highly competitive industry, with a unique dependence upon

subcontracting. A few large firms, some national in scope, dominate the market for large prime

contracts. A prime contractor interested in bidding on a contract will decide what trades it will

self-perform and what trades it will subcontract. The industry is advised of the project and the

opportunity and requirements for bidding on the prime contract or on subcontracts through

a variety of sources, such as the Dodge report and Construction Management Data. The City

will also advertise the opportunity in newspapers and post it on the internet; and trade groups,

some focusing on contractors by race, ethnicity or gender, may alert potential bidders from

their membership. Prime contractors may solicit subcontractors from lists of those with whom

they have had prior productive relationships. The specifications can be reviewed by those who

have some interest at the offices of the prime contractors who intend to bid, or, possibly, at other locations such as at the offices of trade groups. For City projects, the City provides a location for reviewing specifications. Prime contractors may receive subcontracting bids until a few hours before their bids must be filed, and, generally, their project managers will then decide what subcontractors will be used and, partly on the basis of those bids, decide the prime bid amount. The prime contractor may choose to select a higher bidder for a trade, but that decision is subject to the economic imperative of being the lowest prime bid. By state law, the City must generally accept the lowest responsible bidder, subject to the constraints of the set-aside programs.

The profit margins are generally tight, a few percent, and the hazards are considerable. The project can rapidly become a loser if the bidding estimates are faulty, if the weather is uncommonly adverse or if subcontractors do not complete their work competently, on time, and on budget. Consequently, prime contractors tend to turn to subcontractors with whom they have had a prior and favorable experience. Preparing estimates and reviewing estimates are expensive. Accordingly, prime contractors prefer to have some, say three, bids from each trade, but not too many, and it is not worthwhile for a subcontractor to prepare a bid unless it has some realistic likelihood of obtaining the contract. While some prime contractors will occasionally entertain an unsolicited bid, the likelihood of success is so marginal that there is little incentive to submit unsolicited bids.

Construction is, to a considerable extent, seasonal, and the industry is highly elastic. Continued operations require successful bids. When a contractor obtains work it can employ those tradesmen necessary to complete the project and, if it does not have the necessary equipment, rent what is appropriate. A thread of continuity is the availability of skilled

craftsmen through the craft unions.  Accordingly, a construction firm can rapidly expand or contract, within limits, but a firm generally performing $100,000 contracts is unlikely to have the managerial know-how necessary to perform successfully a $1,000,000 contract.  Smaller firms are not, therefore, bidders on large prime contracts and generally focus on subcontracts in a particular trade.

Another constraint upon the ability to bid larger contracts is access to capital and credit.  While some construction work requires little financial investment, *e.g.*, cleaning, other trades may be somewhat capital-intensive, *e.g.*, cement contractors, who must have the necessary equipment and inventory.  But all must meet payrolls, and there may be considerable delays between performance and payment.  All must meet bonding and insurance requirements.  A prime contractor will have far greater revenues than a subcontractor because much of its revenue flows through the prime to the subs.  It is not uncommon for the prime contractor to obtain lien waivers from its subcontractors before they are paid (which reduces their leverage to obtain payment), but to delay payment until after it has submitted the lien waivers and has received resulting progress payments from the project owner.

The universe of construction firms in the Chicago area, as well as the area demographics, has changed considerably over time.  One set of numbers discloses the following (other sets differ slightly):  In 1982, Hispanic small businesses constituted 4,463 or 1.8% of Chicago area small businesses.  The corresponding numbers for African-American small businesses was 12,473 or 5%, for other minorities (primarily Asian-American) 8,382 or 3.3%, for women 73,426 or 29.3%, and white males 151,913 or 60.6%.  The percentage in construction, however, was considerably less:  African-American 3.6%, other minority 2.1%, and women 5.5%.

During the intervening years the demographics of the area have changed considerably. The African-American percentage of the population has remained relatively stable. The Hispanic percentage has increased dramatically, mostly by immigration of Mexicans, and the Asian percentage has increased from a small number to a significant presence. The City itself, according to the 2000 census, is approximately 60% minority, with Hispanics comprising 26% of the population. From 1982 to 1997, black-owned businesses increased from 12,473 to 35,569, a 185.2% increase; Hispanic-owned businesses increased from 4,463 to 27,482, an increase of 515.8%; other minority-owned (principally Asian) increased from 8,382 to 34,894, a 316.3% increase; minority women-owned businesses increased from 73,426 to 161,252, a 119.6% increase, and non-minority men-owned businesses increased from 151,913 to 341,238, a 124.6% increase (this last category includes some that may be publicly-owned, with a diverse shareholder base, but no one has suggested that any of them is minority- or women-controlled). In short, the number of firms increased significantly for all groups, with the growth of Hispanic firms reflecting, in all likelihood, Hispanic population growth to some extent. The increase in both African-American and Hispanic firms was from small bases.

But what relevance do those statistics have to the issues before the court? We must determine whether there was and is discrimination in the Chicago construction industry in which the City actively or passively participates, and which the City's program is narrowly tailored to remedy. We turn, then, to the legal standards to be applied.

Plaintiff has contended, and I rejected (2003 WL 1786489 (N.D. Ill.)) the notion that the court should not consider post-enactment evidence, either evidence relating to the period that predates the enactment of the ordinance but was developed later, or evidence that relates to a later period.

It is essentially a given that government has a compelling interest in eradicating discrimination. <u>Contractors Association of Eastern Pennsylvania, Inc. v. The City of Philadelphia</u>, 6 F.3d 990 (3d Cir. 1993); <u>Associated General Contractors of California, Inc. v. Coalition for Economic Equity</u>, 950 F.2d 1401 (9th Cir. 1991). The City should have produced strong evidence that there was pervasive discrimination in the construction industry, and that the program was remedial in nature, before embarking on the M/WBE program. *See* <u>Shaw v. Hunt</u>, 517 U.S. 899, 909-10 (1996). A failure to have done so would have permitted a successful attack immediately after enactment and a district court might have acted well within its discretion in refusing to allow the government an extended time to marshal its facts. *See* <u>Associated Grand Contractors of Ohio, Inc. v. Drabik</u>, 214 F.3d 730 (6th Cir. 2000). A failure to have done so could also call into question whether the program was remedial, or for another purpose. <u>City of Richmond v. J. A. Croson Co.</u>, *supra*, at 493-94 (1989); *see* <u>Schurr v. Resorts International Hotel, Inc.</u>, 196 F.3d 486, 498 (3rd Cir. 1999).

The issue here, however, is not whether or not the City Council adequately did its homework in 1990, but whether the program was appropriately remedial in its inception, and whether there is sufficient evidence in 2003 of a continuing need, and of narrow-tailoring, so as to cause the program to pass constitutional muster. Indeed, courts should be wary of grading legislative papers and rejecting the legislative decision regardless of the subsequent showing of justification, and I know of none that has done so.

The City did not have to prove its justification in 1990, but it does have to show that it then had, based on the evidence, a legitimate remedial purpose. The City has demonstrated, since then, continuing support for that program. Plaintiff is not seeking damages for, say, loss of a contract in 1991. It seeks prospective relief. The focus, then, assuming that the City can

establish that it enacted the program for a legitimate purpose in 1990, should necessarily be upon whether there is a compelling need for such a program in 2003, and whether it is now a narrowly-tailored remedy for discrimination. If the focus is more upon the present than the past, then the passage of time cannot defeat plaintiff's claim, as we previously ruled. And if the City is to go forward with its contention that a failure to have such a program makes it a passive participant in discrimination, it must present evidence that there were and are discriminatory practices in the construction industry.

With few exceptions, *e.g.*, Rothe Development Corp. v. United States Department of Defense, 262 F.3d 1306 (Fed.Cir. 2001)(inadmissible to establish a strong basis but admissible for other purposes); West Tennessee Chapter of Associated Builders and Contractors, Inc. v. Board of Education of Memphis City Schools, 64 F.Supp.2d 714 (W.D. Tenn. 1999), courts have permitted post-enactment evidence in both senses of the term, both to buttress the original determination and to demonstrate that there remains pervasive discrimination in the industry which the remedy is narrowly tailored to address, *e.g.*, Contractors Association of Eastern Pennsylvania, Inc. v. City of Philadelphia, 6 F.3d 990 (3rd Cir. 1993); Concrete Works of Colorado, Inc. v. City and County of Denver, 36 F.3d 1513 (10th Cir. 1994); Engineering Contractors Association of South Florida, Inc. v. Metropolitan Dade County, 122 F.3d 895 (11th Cir. 1997). So do I. I do not read BAGC v. County of Cook (N.D. Ill.), *supra*, at 1093, to the contrary, where Judge Grady permitted the introduction of such evidence and the Court of Appeals, while noting that the enactment had to be supported by a strong evidentiary basis (at p. 645), did not reject that post-enactment evidence as inadmissible.

While the relative burdens of the parties remain in dispute, *see* Concrete Works of Colorado, Inc. v. City and County of Denver, Colorado, 124 S.Ct. 556 (2003). I believe that the

initial strong showing serves primarily as a screening device to determine whether the legislation was adopted for a proper and documented reason: to remedy by appropriate means discrimination in the marketplace affecting the disbursement of public funds. If challenged, the government enacting the program must demonstrate pervasive discrimination. The opponents then seek to undermine that demonstration and, ultimately, to prove that the claimed discrimination is not sufficient to support the remedy adopted, or that the remedy is not narrowly tailored to address the discrimination demonstrated. And all that may be largely semantics because, as noted in <u>BAGC v. County of Cook</u> (7th Cir.), *supra*, cases rarely turn on those allocations. Further complicating matters, gender programs are governed by intermediate scrutiny, although, as also noted in <u>BAGC v. County of Cook</u> (7th Cir.), *supra,* the difference between strict and intermediate scrutiny, as they pertain to affirmative action programs, may not be particularly great.

What, then, were the circumstances in 1990? The construction industry was dominated by a few large firms, large enough to undertake large contracts, and a myriad of smaller firms, very few of which were owned by African-Americans, Hispanics, Asians or women. None of the larger firms was so owned. The craft unions played a major role in the industry, and they then were being forced by federal lawsuits to alter course after a history of exclusion. City procurement had been riddled with racism and political cronyism, with specifications often being drafted to accommodate a favorite contractor, or subsequent modifications being used to sweeten the initial award, although that too was changing. Prime contractors had a cadre of subcontractors whom they solicited for bids, subcontractors in whom, because of prior dealings, the primes had confidence would perform to specifications, on time and within budget. Those subcontractors were almost invariably owned and operated by white males.

The pre-enactment and post-enactment evidence provides strong evidence of the City's tax dollars going to an industry pervasively discriminating against African-American firms. The evidence is less clear regarding Hispanics and women because they then were a minor presence in construction, and virtually non-existent for Asians, as they were then an insignificant factor in that industry. I think, though, that it is not worthwhile to reach conclusions about 1990, when the post-enactment evidence bears upon both conditions then and conditions now, and the emphasis is upon prospective relief. We fast forward, then, to a more recent time.

As I have noted, the number of M/WBEs in Chicago-area construction has increased dramatically, and Dr. Timothy Bates, one of defendant's experts, attributes that in large measure to a decrease in barriers. That does not mean, however, that MBEs and WBEs are now playing on a level playing field. They are not. Before we get to why I conclude that to be so, and what, if anything, the City can do about it, let us discuss briefly what this case is not about.

Defendant and the intervenors emphasize the impact on firm formation of past discrimination. They contend that union discrimination retarded entry, that the normal progression is generational in a family-oriented industry, the progression being from entry level unskilled employment to development of craft skills to development of managerial skills and, finally, entrepreneurship. That may well be so, with the City complicit in that discrimination (*e.g.*, Washburne Trade School), but I do not read Croson or BAGC v. County of Cook (7th Cir.) as permitting set-asides for existing firms because there would have been more firms in the absence of that past discrimination.

Dr. Bates testified that African-Americans were long relegated, in the professions, in

large measure to "teaching and preaching," and that the perceptions of what is possible are very slow to change. I have no doubt that the lingering effects of centuries of pervasive discrimination are powerful. *See* Cunningham, Loury and Skrentny, <u>Passing Strict Scrutiny: Using Social Science to Design Affirmative Action Programs</u>, 90 Geo.L.J. 835 (2002) and Pompian, <u>Expectations of Discrimination as a Justification for Affirmative Action</u>, 8 Va. J. Soc. Policy & L. 517 (2001). But if the playing fields were now level, and there were no barriers to entry, the City would not be participating, passively or otherwise, in pervasive construction industry discrimination. I recognize that there have been suggestions to the contrary, in <u>Contractors Association of East Pennsylvania, Inc. v. City of Philadelphia</u>, *supra*, and <u>Adarand Constructors, Inc. v. Slater</u>, 228 F.3d 1147 (10th Cir. 2000), but I cannot agree. Racial preferences are, by their nature, highly suspect, and they cannot be used to benefit one group that, by definition, is not either individually or collectively the present victim of discrimination, at the expense of another group. There may well also be (and the evidence suggests that there are) minorities and women who do not enter the industry because they perceive barriers to entry. If there is none, and their perception is in error, that false perception cannot be used to provide additional opportunities to M/WBEs already in the market to the detriment of other firms who, again by definition, neither individually nor collectively, are engaged in discriminatory practices. While there are good reasons, rooted in history, to encourage firm formation by minorities and women, the means to do so cannot be by assigning a largely speculative figure of who might have entered, and then using that figure to benefit existing M/WBEs.

Nor are we on much firmer ground in seeking to determine whether there is a significant statistical disparity between the award of contracts to M/WBEs available, willing and able to

perform, and the award of contracts to others similarly situated – a basis cited in <u>Croson</u> as possibly justifying an affirmative action program. We can determine with some confidence how many construction firms there are in the Chicago area and how many are minority- or woman-owned. That establishes availability. We can determine the percentage of contract awards and contract dollars that went to those firms. That establishes use. But we know very little about their willingness and ability. The City concedes that it has not determined the number of M/WBEs who are qualified, willing and able to perform on construction contracts for the City as subcontractors.

Firms bidding in the Target Market program must be pre-qualified. The number is very small and, indeed, the evidence established that there are few Target Market construction contracts and that the entire Target Market program is in essence a niche market for a handful of firms that can perform the smaller, but not the larger, prime contracts. We know, in general, how many firms are certified, which perhaps could serve as a rough proxy for willing and able, but that number is but a small fraction of the number of M/WBEs in the Chicago area. The parties agree that the Chicago program is essentially a subcontracting program, and we know what percentage of the subcontracts, in number and dollar amount, went to M/WBEs. But those figures do not help with a disparity analysis since, measured against the raw numbers of firms available in the area, they suggest overuse. They are skewed by the program itself. Perhaps an analysis of the bids of subcontractors to all prime contractors seeking awards of City construction projects would have provided some indication of who was available, willing and able. It is reasonable to assume that a firm will not go to the expense of preparing a bid if it is unwilling to perform or does not think itself competent to do the work. But that information was not forthcoming, although one of defendant's experts sought it.

Apparently for these reasons the City's experts did not rely at all, or relied only minimally, on the available, willing or able concept, and some thought the concept itself was not useful. The plaintiff's experts, as one might expect, claimed that concept as central to a Croson analysis.

Defendant's experts turned to other data, much of it derived from census data. Some of that data was national in scope, some regional, some targeted to the Chicago market, generally, and some to the Chicago construction industry. Some was rather old and some data was not available for analysis by plaintiff's experts and therefore was not considered by the court. In a few instances the nature of the information changed, thus raising comparison problems, such as the description of loan difficulties, minority women being MBEs or WBEs, or both, and firms owned by husband and wife being a WBE or not. In other instances, the universe of information did not fit neatly into the patterns the experts were seeking to explore. For example, small business data included very small businesses indeed, far too small to bid on City construction projects. For another, the relevant Standard Industrial Classifications (SICs) were not entirely relevant because they included -- SIC 87 particularly -- occupations and professions rather far removed from the construction industry. The results of various surveys were used, but some of them had a small number of responses or otherwise were not entirely reliable. Data could be over-aggregated or so disaggregated as to be meaningless.

Even so, a reasonably clear picture of the Chicago construction industry emerged. Some matters were relatively undisputed. Chicago area M/WBEs are, on the whole, smaller and of more recent vintage than construction firms in the locale generally. City construction projects are generally larger than most construction projects. Only a few M/WBEs are large enough to be City prime contractors, even though there is considerable elasticity in firm capacity as a

firm can rent equipment and hire tradesmen. Accordingly, the City program is aimed primarily at subcontracting. Even in subcontracting size matters. A one-person firm that remodels kitchens is unlikely to seek City business.

While the size of the disparities was disputed, it is evident that minority firms, even after adjustment for size, earn less and work less, and have less sales to other businesses. Women and Hispanics are less likely to be union members than non-minority men and, although they have a higher union membership, African-Americans are more concentrated in the lower-paying jobs. Much of the explanation for the lesser success may well be attributable to poor schools and poor neighborhoods. It does not appear surprising that a minority firm engaged in rehab work in Grand Crossing, Markham or Little Village, does not do as well as an established firm of comparable size doing high-end kitchens on the Northshore. The lesser membership or lower paying jobs in unions may possibly indicate discrimination and there is some anecdotal support for that, as well as case law. *See e,g,,* Equal Employment Opportunity Commission v. Pipefitters Association Local Union 597, 2002 WL 976618 (N.D.Ill.), *rev'd on other grounds*, Equal Employment Opportunity Commission v. Pipefitters Association Local Union 597, 334 F.3d 656 (7th Cir. 2002). But, to the extent discrimination by unions exists, it directly impacts employment, not ownership, and it is directly addressable as a violation of law. Many years have passed since the federal government has believed it necessary to seek sweeping injunctive relief against a Chicago area trade union.

True it is that the self-employment rates of most minorities is far less than that of non-minority males, although the record is somewhat mixed. Some Asians, notably Chinese, Japanese and Koreans, have far higher self-employment rates (and education) than the general population, although that employment is largely in small local service businesses. Indeed, the

statistical evidence of disparities respecting Asians that could support an inference of discrimination is thin, and any attempt to disaggregate that information for the various ethnic groups comprising that population reduces the numbers to such an extent that they can provide no meaningful analysis. We do know that immigration has swelled the Hispanic and Asian populations, and that the Hispanic migrants have far less education than the general population. For both groups there remains a question whether they are victims of discrimination or whether they, like countless others before them, face language and cultural barriers (and for some, the absence of documentation) common to all, or virtually all, who have recently come to this land. English is a difficult language, a language with many fathers, a fact immortalized for my generation in Leo Rosten's The Education of Hyman Kaplan. Some of the evidence is at least consistent with the view that there is pervasive discrimination in the Chicago area construction industry, but it is also consistent with societal explanations. There are, however, two areas where societal explanations do not suffice.

One witness spoke of the three imperatives in construction: management, money and markets. The market failure targeted was the failure of prime contractors to solicit M/WBEs for non-goals work. That market failure was demonstrated in several ways. One was anecdotal evidence. A pervasive theme of that testimony was that the M/WBE firm was not solicited, or seldom solicited, for non-goals work, even though it was eager and available to do that work. Another was a Metra survey of M/WBEs, in which approximately 50% of those responding reported that they were seldom or never solicited for non-goals work.

A third is the dramatic decline in the use of M/WBEs when an affirmative action program is terminated, and the paucity of use of such firms when no affirmative action program was ever initiated. One example of that was considered by the City Council, which

was advised that the termination of the Metropolitan Water Reclamation District program dropped MBE participation from 23.6% in the first half of 1989 to 10.8% in the last six months, and WBE participation from 16.3% to 7.4% during the same time periods. The falloff in M/WBE use by Cook County after its program was enjoined is a bit more confused. According to the City, minority participation in prime contracts dropped to 5.74%, with WBEs having none, and MBE subcontracting dollars were 7.09% and WBEs 5.05%. Usage thus dropped from 40% to 17.88%. According to the County's Contract Compliance Administrator, who testified by deposition, the total MBE participation after the injunction was 31% and WBE participation 1%. The discrepancy in those figures has not been explained. Finally, Dr. George LaNoue, testifying for the plaintiff, compiled figures for closed-out County contracts and came up with MBE participation of 11.58% and WBE participation of 7.43%, well short of the prior (and attained) goals of 30% and 10%. I note, however, that the City figures, based on a review of specified County contracts, are consistent with what has been reported around the country. In the ten states with federal Disadvantaged Business Enterprises (DBE) programs, but no corresponding state program, DBE use on federally-funded contracts has ranged from 8.9% to 16.2% and on state contracts from zero to 5.2% (and the next highest was 3.8%). Following injunctions, or voluntary termination of programs in a number of cities and counties, M/WBE participation dropped sharply, in one instance from 25% to .6% and in another by 99%. In Minnesota, a DBE program used DBEs for about 11% of the work. The program was enjoined, and use went from initially zero to 1.4%. The injunction was lifted and use climbed to 8.7% before the program was enjoined again.

Dr. George LaNoue, testifying for plaintiff, believed the falloff was an artifact of the programs – the programs resulted in greater use than in a natural market. Dr. John Lunn, also

for the plaintiff, suggested a number of reasons why M/WBEs might not be used on private non-goal projects, including being higher-priced or not being available because they are at capacity with goals work for a public or private entity. But we are talking about lack of solicitation, not lack of use, although the latter follows from a failure to solicit. Further, one estimate was that 80% of the M/WBEs performing city work were the low bidders for the subcontract. And if we add in that M/WBEs are working less hours, that City and other public entity goals are almost invariably exceeded, that capacity is relatively elastic, and that the anecdotal evidence provides no support — and that there was virtually no factual support offered for those suggestions — it is difficult to credit alternative explanations.

There is another reason as well that leads to the conclusion that M/WBEs are solicited for subcontracting work on non-goal private construction contracts in the Chicago area far less than white male firms. It follows as a matter of economics. The anecdotal evidence indicates that M/WBEs are sometimes ignored because of racial, ethnic or gender animus or stereotyping. That cannot be quantified. But prime contractors, without any discriminatory intent or bias, are still likely to seek out the subcontractors with whom they have had a long and successful relationship. In a highly competitive industry, where the profit on a project, slim to begin with, can disappear because of the failure of one subcontractor to perform, why take a chance?

The tendency to stick with the old and ignore the new affects all newer firms, not just M/WBEs. But here the vestiges of past discrimination linger on to skew the marketplace and adversely impact M/WBEs disproportionately as more recent entrants to the industry. Not too long ago white male firms had a near monopoly in the industry, and they, therefore, are the beneficiaries of a continuing adherence to old relationships. That adherence may not generally be the result of intentional discrimination, but the City has a compelling interest in preventing

its tax dollars from perpetuating a market so flawed by past discrimination that it restricts existing M/WBEs from unfettered competition in that market. *See* <u>Croson</u>, *supra*, at p.727. <u>Adarand Constructors, Inc. v. Slater</u>, *supra*, at 1165. It is a form of disparate impact, which government can remedy. <u>Washington v. Davis</u>, 426 U.S. 229, 248 (1971). *See generally* Primies, <u>Equal Protection and Disparate Impact: Round Three</u>, 117 Harv.L.R. 494 (2003). Competitive pressure, the experts agree, will in time attenuate the effect of past discrimination because the effort to submit the lowest responsible bid requires a prime contractor to rely upon the lowest responsible subcontractor bids. And opportunities are expanding. But any failure to consider newer subcontractors slows that process.

Besides management and market access, a key element in the industry is money. Dr. Bates reported to the City Council in 1990 that there was a wide disparity in debt capital between startup African-American small businesses and white male small businesses. Part of that was due to less wealthy family and friends, but regression analysis disclosed that, nationally, African-Americans obtained $2.37 in loans for each $1 in equity, while white male firms obtained $2.72. He later concluded, using 1993 Federal Reserve System National Survey of Small Business Finance (NSSBF) data, that minority firms receive smaller loans because they are minorities. That was followed up at trial by the report and testimony of Dr. David G. Blanchflower, an expert in econometrics. He concluded, based on regression analyses and other evidence, that minority-owned firms are substantially more likely to be denied credit than other groups. He did not conclude that women were victims of discrimination in the credit market. Hispanics were, based on 1993 data, victims only if those who did not seek loans because of a fear of denial are treated as denials, but the 1998 data showed a significant disparity in denials. African-Americans are particularly disadvantaged. They have considerably greater problems

in obtaining loans and, when they do, they on average pay 1% more interest than others. Asians and Hispanics pay approximately .5% more. While Dr. Blanchflower did not find a significant statistical deviation in his regression for women using 1993 data, Dr. John Lunn, an expert for plaintiff, did so using 1998 data, although that was only slightly more than two deviations.

Dr. Blanchflower's conclusions respecting denials were subject to vigorous attack, although his findings respecting higher interest rates were largely ignored. That attack centered, in large part, on his use of data. As noted previously, some was national, some regional and some local, and the combining of 1993 and 1998 data created problems because the information obtained was different. He relied upon a survey based upon a rather small response rate, and he included SIC 87 data, which was only marginally relevant. But even using the NSSBF data in the manner Dr. Lunn thought appropriate, he still came up with significant disparities relating to African-Americans and, to a lesser extent and from a small sample, and for only one period, Asians – unless SIC 87 is entirely factored out. Dr. Lunn conceded that credit availability appeared to be a problem for African-American firms. Dr. LaNoue suggested that the absence of a business plan was a variable that should have been considered, but there was virtually no evidentiary support for that position. When Dr. Blanchflower factored out SIC 87, but used data for all firms, not just construction firms, to avoid small sample problems, his prior results held.

The above is itself a small, simplified and selective view of what was a lengthy battle of number-crunching experts. Each of the approaches was vulnerable to criticism, but each reinforced the others, and collectively they support a pattern. I believe, out of the welter of statistics and other information, a strong basis in evidence emerged that African-American

construction firms in the Chicago area are victims of discrimination in the credit market, that Asian and Hispanic firms probably encounter some discrimination in that market, and that women may possibly encounter some discrimination there.

Access to capital obviously is important to the ability of firms to bid and perform. A higher interest rate may make it impossible to submit the lowest bid in this highly competitive industry, or, indeed, to survive. I have not mentioned before evidence of perceptions of minorities and women of discrimination in lending, African-Americans particularly, because perceptions can be faulty. But here the perceptions have a basis in reality. Nor have I mentioned anecdotal evidence of perceptions that M/WBEs are more often than others to sign lien waivers before getting paid or are expected to provide additional services not required of others because there is no solid evidence that is so. It may, indeed, reflect the fact that they are living closer to the margin, with less cash reserves and less access to credit, and thus less able to do more or to wait for payment. The evidence indicates that many prime contractors, perhaps most, are unwilling to pay subcontractors before being paid themselves, and that means the subcontractors must give up any lien leverage before they receive payment.

Given these distortions of the market and these barriers, is the City's program narrowly tailored as a remedy? It is here that I believe the program fails. There is no "meaningful individualized review" of M/WBEs. Gratz v. Bollinger, 123 S.Ct. 2411, 2431 (2003)(Justice O'Connor concurring). Chicago's program is more expansive and more rigid than plans that have been sustained in the courts. It has no termination date, nor has it any means for determining a termination date. The "graduation" revenue amount is very high, $27,500,000, and very few have graduated. There is no net worth threshold. A third generation Japanese-American from a wealthy family, and with a graduate degree from MIT, qualifies (and an

Iraqi immigrant does not). Waivers are rarely or never granted on construction contracts, but "[r]egarding flexibility, 'the availability of waiver' is of particular importance . . . a 'rigid numerical quota' particularly disserves the cause of narrow tailoring." Adarand Constructors, Inc. v. Slater, *supra*, at 1177. The City program is a "rigid numerical quota," a quota related not to the number of available, willing and able firms but to concepts of how many of those firms there should be. Formulistic points did not survive strict scrutiny in Gratz v. Bollinger, *supra*, and formulistic percentages cannot survive strict scrutiny.

Waivers, approximately 44% of contract dollars awarded over a nine-month period, were a significant factor in upholding an affirmative action plan in Associated General Contractors of California, Inc. v. Coalition for Economic Equity, *supra*. In that case the record included numerous reports that MBEs were denied contracts despite being the low bidders; that they were told they were not qualified, although they were later found qualified by an outside evaluator; that they were refused work even when they won the contract; and that they were harassed by City personnel. There is virtually no evidence of such rejections, such discriminatory or other conduct here. In that case the program provided for a bidding preference, not a quota. It was restricted to firms having less than an average of $14,000,000 in gross receipts over three years. The City's number is $27,500,000, apparently the highest in the country and well above the $17,000,000 for federal DBE programs. The availability of waivers was similarly important in Coral Construction Co. v. King County, 941 F.2d 410 (9th Cir. 1991), and Adarand Constructors, Inc v. Slater, *supra*. In the latter case the program provided a carrot rather than a stick: additional compensation to prime contractors using DBEs, and DBEs were not presumed disadvantaged. They had to submit to a narrative statement describing the circumstances of their purported economic disadvantage.

Similarly, the goals in <u>Sherbrooke Turf, Inc. v. Minnesota Department of Transportation</u>, 345 F.3d 964 (8th Cir. 2003), were aspirational, not mandatory, and, absent bad faith in administration of the program, a failure to achieve goals is not penalized. Moreover, the goals are far more modest than those of the City program (and the City goals are a floor, not a ceiling), duration limits are in place, the program has a relatively low net worth cutoff, minorities and women are only rebuttably presumed to be socially and economically disadvantaged and others may qualify, and the affected states were required to adopt race-neutral means to the extent feasible.

The City's position garners its greatest support from <u>Concrete Works of Colorado, Inc. v. City and County of Denver</u>, 321 F.3d 950 (10th Cir. 2003), where Dr. Lunn and Dr. LaNoue both testified. As I have remarked before, the tenor of that opinion, and the opinion in <u>BAGC v. County of Cook</u> (7th Cir.), *supra*, differ markedly. Perhaps more importantly, however, the court in <u>Concrete Works of Colorado, Inc.</u> never reached the issue of narrow tailoring, deeming it to have been waived by the plaintiff.

The City points to the waiver authorization in the ordinance and argues that the ordinance can be saved because it is facially sufficient even if it has been unconstitutionally implemented. "We can do better in the future," it says. If lack of waivers were the only infirmity, that might be possible, but I have alluded to others. More importantly, the goals program only partially addresses market access and hardly addresses credit access at all. There are other and more direct ways.

Setting aside business for M/WBEs, both by the City and other governmental entities, has undoubtedly spurred the entry of such firms into the marketplace. It does not, however, directly impact prime contractor selection of subcontractors on non-goals private projects. Dr.

LaNoue has suggested that the City should require primes to solicit M/WBEs and to justify their failure to use any M/WBE who submits the lowest bid. That, of course, is a racial/gender classification, but it is very narrowly tailored. Plaintiff can hardly complain about additional competition for selection based on competence and price. One wonders, though, about the efficacy of such a program. A prime could deliberately target the weaker M/WBEs, reasonably secure in the knowledge it could justify their rejection.

The City has not sought to attack discrimination by primes directly, but it could. To monitor possible discriminatory conduct it could maintain its certification list and require those contracting with the City to consider unsolicited bids, to maintain bidding records, and to justify rejection of any certified firm submitting the lowest bid. It could also require firms seeking City work to post private jobs above a certain minimum on a website or otherwise provide public notice – another Dr. LaNoue suggestion.

Goals do not directly impact difficulties in accessing credit. A set-aside does not address discriminatory loan denials or higher interest rates. But other race-neutral means are available to do so. The City in recent years has increasingly begun to move in that direction, and some of those means increase market access and firm formation as well. One is linked deposits, with the City banking at institutions making loans to startup and smaller firms. The State of Illinois has had a linked-deposit program for many years, going back to the late sixties. *See* The Impact of Linked-Deposit Programs, The Ford Foundation (1968). Others are quick pay and contract downsizing, both of which Dr. Bates thought more important than goals in encouraging the formation and survival of M/WBEs. The City now does engage in contract downsizing, it does quick pay at least in the Target Market program and has initiated some direct payment to subcontractors.

Other existing City programs, if vigorously pushed and perhaps expanded, can also be helpful. They include restricting self-performance by primes, which is now down to 25%; its direct loan program; its waiver of bonds on contracts under $100,000, up from $25,000; its Bank Participation Loan Program; and its 2% local business preference. That last initiative appears to benefit local prime contractors only, which means it only occasionally benefits M/WBEs when such a firm is a prime contractor or is in a joint venture with another firm, but it could be expanded to benefit any prime contractor who uses local subcontractors or subcontractors who have not previously been used by that prime contractor for City projects. The City cooperates with Turner Construction Co. in presenting a seven-week seminar for, primarily, newer construction firms, and that program apparently has been a significant success. The City also engages in its own outreach programs of technical assistance and workshops.

At trial there was little testimony about the effectiveness of race-neutral programs. We do know that various federal DBE programs establish goals as aspirations and rely upon race-neutral means to meet some or most of the goals. Some references to a Maryland program and a New York City program indicated that they had been relatively successful. We do know that the two early Chicago plans were relatively unsuccessful, but they were voluntary plans from a different era.

We have come a long way, as Dr. Bates observed. In my lifetime, the non-coms who taught me squad tactics and how to survive had to ride in the back of the bus to Augusta, Jews were excluded from most large law firms and were subjected to quota restrictions at many colleges and universities, and women were an oddity both in law schools and law firms. Those are now but ugly memories, *see, e.g.,* Diversity in Law Firms, U.S. Equal Employment

Opportunity Commission (2003), but, as many have said, we have a long way to go. As any elementary or secondary school educator will not so cheerfully admit, overturning the effects of centuries of discrimination is a daunting task.

At the same time, we recognize that classification by race is a dangerous weapon. The Supreme Court's experience with legitimizing such classifications, as in Plessy v. Ferguson, 163 U.S. 537 (1896) and Korematsu v. United States, 323 U.S. 214 (1944), has not been a happy one. Even here we heard resonances of racial and ethnic division arising from the program – that African-Americans were preferred because they had more "clout" than Hispanics and Asians, and Hispanics had more "clout" than Asians.

Still, race and ethnicity do matter. The great number of federal, state, county and municipal affirmative action programs are witness to that. And so is Grutter v. Bollinger, 123 S.Ct. 2325 (2003). As that case, and its companion case, Gratz v. Bollinger, *supra*, make clear, however, racial and ethnic classifications remain highly suspect, can be used only as a last resort, and cannot be made by some mechanical formulation. Race and ethnicity do matter – but remedies must be more akin to a laser beam than a baseball bat. The equal protection clause means what it says, we are one nation, indivisible.

The City program in its present guise cannot stand. I do not doubt that the original program was well intentioned and that, at least for some of the classifications, there was strong evidence of discrimination in the Chicago area construction industry justifying bold remedial measures. Viewed through the prism of 2003, however, I cannot conclude that the present program is narrowly tailored to remedy past discrimination and the discrimination demonstrated to now exist.

An appropriate injunction order will be entered, and plaintiff should submit such an

order. I will, however, delay the effective date for six months from now. *See* Simon Property

Group, L.P. v. mySimon, 282 F.3d 986 (7th Cir. 2002).   The City has a compelling interest in

not having its construction projects slip back to near monopoly domination by white male

firms.  I recognize that the executive and legislative bodies of this city cannot permit that to

occur. The City program has been in effect, one way or another, for 18 years.  It was not even

challenged until more than ten years later, and that challenge was dormant for an extended

period as the County case pressed forward.  A brief continuation is appropriate as the City

rethinks the many tools of redress it has available.


                                                          James B. Moran
                                                          JAMES B. MORAN
                                                          Senior Judge, U. S. District Court

        Dec. 29     , 2003.